ANDERSON v. COMMISSIONER OF IN-
TERNAL REVENUE (two cases).

Nos. 9084, 9085.

Circuit Court of Appeals, Seventh Circuit.

Dec. 17, 1947.

Rehearing Denied Jan. 9, 1948.

William H. Dillon, John O. Snook, Bruce S. Parkhill, and Allin H. Pierce, all of Chicago, Ill., for petitioners.

Sewall Key, Acting Asst. Atty. Gen., George A. Stinson, Harry Baum, and Robert N. Anderson, Sp. Assts. to Atty. Gen., and J. P. Wenchel and B. D. Daniels, both of Washington, D. C., for respondent.

Before SPARKS and KERNER, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

These cases involve income tax liability for the years 1939 and 1940. They were consolidated below and here for hearing and decision. The Tax Court held that the taxpayers remained the substantial owners of the shares of stock transferred of record to members of their families, and that therefore the income from such shares was includible in the taxpayers' gross incomes as defined in section 22(a) of the Internal Revenue Code, 26 U.S.C.A.Int.Rev. Code, § 22(a). These petitions seek a review and reconsideration of those rulings pursuant to sections 1141 and 1142 of that Code.

The following facts are substantially supported by the evidence. Petitioners are brothers. In 1937, they were the respective owners of 388 and 360 of the 750 outstanding shares of stock of Robert R. Anderson Company which had been organized by their father and owned and operated by him for many years. In 1937, Herbert was married and had a son 14 years of age. Ralph had three children, aged respectively 14, 8 and 7 years, by his first wife. He remarried in 1939.

On December 1, 1937, taxpayers caused some of their shares to be transferred on the corporate books to members of their respective families. Herbert's wife and child thereby became record owners of a total of 68 shares, while Ralph's children became the record owners of 85 shares. The new certificates were placed in a safe of the company in the care of its secretary, Christiansen, with the knowledge and consent of the donees, who were apprised of the transfers. Ten days thereafter a dividend of $25 per share was declared on the stock, and on the same day taxpayers borrowed the dividends from the transferees and executed in exchange, 6% demand notes, which were also kept in the office of the company. Christiansen placed the certificates in envelopes bearing the names of the donees.

On April 1, 1938, taxpayers caused more of their shares in such company to be transferred to said respective parties on such corporate books, and such certificates were placed with the others last mentioned. As a result thereof the record ownership of Herbert's wife and child was increased to a total of 140 shares, while the record ownership of Ralph's children was increased to a total of 175 shares. A few days later another dividend of $25 per share was declared, which taxpayers again borrowed from the transferees in exchange for 6% demand notes. These were likewise placed in the company's safe.

On April 15, 1939, taxpayers caused additional shares of this company to be transferred in the same manner as before and the new certificates were placed in the company's safe with the others. Thereby the record ownership of Herbert and wife and child was increased to a total of 228 shares, while the record ownership of Ralph's children and second wife was increased to a total of 307 shares. Two weeks later a dividend of $50 per share was declared, and taxpayers again borrowed the dividends from the transferees and again executed 6% demand notes which were placed in the company's safe. No interest was paid on any of the notes given for the borrowed dividends.

On December 31, 1941, taxpayers each executed new 6% demand notes on the

872

amount of interest then due. Each taxpayer devoted the dividends he borrowed to his own business or personal use, and not to the support or maintenance of his wife or children. Some of the dividend checks were endorsed by taxpayers or by Christiansen in the names of the payees.

After the transfers taxpayers continued to manage and direct the affairs of the corporation in the same manner as before. No formal stockholders' meetings were held after the transfers until November 9, 1940.

In 1940, taxpayers decided to convert the business from a corporation to a partnership. With the consent of all the members of the family, it was arranged that taxpayers and their wives would acquire the stock standing in the names of the children in such proportions that each would own one-fourth of the stock, in exchange for notes to the children.

Accordingly, on November 19, 1940, transfers were made on the corporate books placing the entire outstanding stock in the names of taxpayers and their wives in equal amounts of 187½ shares each. Thereupon, the taxpayers and their wives executed 6% demand notes to the children in amounts based on the book value of the shares. These were likewise placed in the company's safe. It was understood that when the sons reached the age of 25, or finished school, they could use the notes or proceeds to purchase an interest in the partnership, while the daughter would receive one-half of the amount of her note when she reached the age of 25, or married, and the other half when she was 30. A partial liquidation distribution was made before the end of 1940, and the liquidation was completed in 1941. On December 31, 1941, additional notes were given to the children in the amounts of unpaid interest, and these were placed in the company's safe with the others. At the same time taxpayers took credits against the principal of the notes for income tax payments and investments made on behalf of the children, these credits being acknowledged in most instances by proper endorsement on the notes.

In 1941 taxpayers decided to create trusts for the children, the corpora to consist of the various notes which had been executed

and were still in the company's safe. The parties thereupon caused a trust agreement to be prepared, naming their brother-in-law as trustee, and instructed Christiansen to destroy the old notes and substitute new ones payable to the trustee. The new notes were prepared, but the old ones were never destroyed. This trust agreement was executed January 2, 1942, but when the trustee later inquired about the payment of interest on the new notes he was informed by taxpayers that the trust agreement was void and would be cancelled on the advice of taxpayers' attorney. The trust agreement was thereupon marked "void" and returned to taxpayers with the new notes.

No gift tax returns were filed for 1937 and 1938 because each gift was valued by taxpayers at less than the $5,000 gift tax exemption allowable for those years. In 1939 the value of each gift was over $4,000 but less than $5,000, but no gift tax return was filed for that year because taxpayers were unaware of the reduction of the allowable exemption from $5,000 to $4,000.

The dividends on the transferred shares were reported as the income of the wives and children. The taxes were paid on their behalf by taxpayers. The Commissioner determined that the transfers were without federal income tax effect, and included in taxpayers' gross incomes for 1939 the dividends paid in that year on the transferred shares, resulting in the 1939 deficiencies in controversy. The Commissioner likewise disregarded the transfers in determining the capital gain realized by taxpayers upon the 1940 liquidation distribution, and included in their gross incomes for that year the gain attributable to the number of shares originally held by them, resulting in the 1940 deficiencies in controversy. The Tax Court concluded that the alleged gifts were not bona fide, that taxpayers did not intend to relinquish dominion and control over the transferred shares, and sustained the Commissioner's deficiency determinations.

After the Tax Court's opinion was promulgated, and on August 17, 1945, taxpayers filed a motion for rehearing and reconsideration. This motion was granted insofar as it requested modifications in certain particulars of the Tax Court's findings of fact,

and in all other respects it was denied. Thereafter, on November 19, 1945, taxpayers filed a motion for special leave to file motion for further hearing and reconsideration, which was denied.

This last motion was based upon a chancery decree of November 19, 1945, in the Superior Court of Cook County, Illinois, in the cause of Fay Anderson, et al., against these taxpayers. The plaintiffs there, who were the alleged donees herein referred to, sought and received a declaratory decree determining the rights of the parties thereto arising out of the alleged gifts here involved. That decree sustained the donees' contentions that the alleged gifts here in controversy were in each case valid and bona fide. The Tax Court in this case before us held otherwise, as affecting federal taxation.

██ Appellants here contend that the validity of a gift under a state law is determinative of whether the donor remains the substantial owner for purposes of section 22(a) of the Internal Revenue Code. We think this contention is not supported by the decisions. Here we are dealing with the intrafamily gift, and in such case, special scrutiny of the arrangement is necessary lest what is in reality but one economic unit be multiplied into two or more by devices which, though valid under state law, are not conclusive so far as section 22(a) is concerned. Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788. That section is not to be circumscribed by refinements of legal title or local law concepts of ownership. By its enactment Congress exercised to the full measure its constitutional power to tax income. Helvering v. Clifford, supra; Helvering v. Stuart, 317 U.S. 154, 63 S.Ct. 140, 87 L.Ed. 154; Douglas v. Willcuts, 296 U.S. 1, 56 S.Ct. 59, 80 L.Ed. 3, 101 A.L.R. 391; Irwin v. Gavit, 268 U.S. 161, 45 S.Ct. 475, 69 L.Ed. 897. The Supreme Court has repeatedly said that taxation is an intensely practical process concerned less with legal formalities than with economic realities and that tax consequences flow from the substance rather than the form of a transaction; that command over property or enjoyment of its economic benefits marks the real owner for federal income tax purposes. See also Commissioner v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670, 164 A.L.R. 1135; Harrison v. Schaffner, 312 U.S. 579, 61 S. Ct. 759, 85 L.Ed. 1055; Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, 131 A.L.R. 655; Corliss v. Bowers, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916; Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731; Coffey v. Commissioner, 5 Cir., 141 F.2d 204. From these cases it seems to be quite clear that mere passage of title to income-producing property through devices which are valid under state law will not insulate the transferor against federal income tax liability unless the passage of title is accompanied by a complete shift of the economic benefits of ownership, direct and indirect.

██ It seems clear to us that the evidence here is quite substantial to support the Tax Court's findings of facts and that the taxpayers remained the substantial owners of the stock transferred to their respective families, and we have no authority to disturb those findings. The decree of the Illinois Superior Court having been entered subsequently to the order here sought to be reviewed, we think there was no error in overruling petitioners' "motion based on that decree, for special leave to file their motion for further hearing and reconsideration." Even if that decree had preceded the one here sought to be reviewed, it could not overcome the Tax Court's findings of facts. See Tyson v. Commissioner, 8 Cir., 146 F.2d 50.

Petitioners further contend that the Tax Court failed to pass on the 1940 transfers, that is to say that the Tax Court did not expressly find that the 1940 transfers, like those made in prior years, were without federal income tax effect. The Commissioner ruled that taxpayers are the owners for tax purposes of all the shares originally held by them prior to the first transfer in 1937. He disregarded the 1940 transfers as well as those made in prior years. We are convinced, however, that the finding by the Tax Court that the 1940 transfers were without federal income tax effect must be implied by the concluding statement of the Court's opinion: "Consid-

ering all the facts, in the light of the close family relationship existing here, we conclude that petitioners have not sustained their burden of proving the respondent in error in his determination."

Furthermore, after the Tax Court's opinion was promulgated, taxpayers filed a motion for rehearing requesting additional findings, which the Tax Court granted to a limited extent. Taxpayers in their requested additional findings, aggregated all the transfers together and there made no charge, as they do now, that the Tax Court's findings were deficient with respect to the 1940 transfers. It was in their motion for special leave for a further hearing and reconsideration, filed on November 19, 1945, that, for the first time, they urged that the Tax Court should have made an express finding as to the 1940 transfers. Under these circumstances we think there is no merit in this contention.

Petitioners further contend that under the provisions of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., it is the duty of this court to review the entire record and to determine whether the facts and conclusions of the court below are supported by and in accordance with the reliable, probative and substantial evidence in the record. This question was raised in the case of Credit Bureau of Greater New York, Inc. v. Commissioner, decided by the Second Circuit Court of Appeals, 162 F.2d 7, 9. That court said: "We see no reason to do so since the evidence here sufficiently supports the Tax Court's findings under any theory of judicial review." That statement is equally applicable to the facts here presented, and it may further be said that in the instant case the facts which we record as substantial to support the findings are admitted to be true.

Petitioners rely upon Lincoln Electric Co. v. Commissioner, 6 Cir., 162 F.2d 379, 382. The court there said that the power to review Tax Court decisions "doubtless has been broadened" by the Administrative Procedure Act, observing, however, that that statement was unnecessary to its decision. It was also irreconcilable with the same court's opinion, by a different judge, in Commissioner v. Wiesler, 6 Cir., 161 F.

2d 997. We are unable to agree with the conclusion reached in the Lincoln Electric case. We think petitioners' contention in this respect is without merit. We find no error in the Tax Court's ruling.

Affirmed.